**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTWION E. THOMPSON,
         *Petitioner-Appellant*,

v.

D. L. RUNNELS, Warden; ATTORNEY
GENERAL'S OFFICE,
         *Respondents-Appellees.*[*]

No. 08-16186

D.C. No.
5:05-cv-01264-
JF

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeremy D. Fogel, District Judge, Presiding

Argued and Submitted
May 11, 2012—Pasadena, California

Filed January 24, 2013

Before: Alfred T. Goodwin, Marsha S. Berzon,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Concurrence by Judge Goodwin;
Dissent by Judge Berzon

---

[*] The caption has been updated to correct the spelling of Runnels's name.

## SUMMARY[**]

### Habeas Corpus

Affirming the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging the admission of petitioner Thompson's confessions to the murder of his girlfriend, the panel held that the state court reasonably denied relief based on *Oregon v. Elstad*, 470 U.S. 298 (1985), which was clearly established law as of the time of the final state court adjudication on the merits.

At the time of the state court adjudication on the merits, the United State Supreme Court was considering but had not yet decided *Missouri v. Siebert*, 542 U.S. 60 (2004) (involving delayed *Miranda* warning during a deliberate two-step interrogation process). The panel was not persuaded by Thompson's contention that the state had waived its argument that only *Elstad* was the relevant clearly established law because, to determine whether the state court decision violated the Anti-Terrorism and Effective Death Penalty Act, the panel must first identify and apply the correct governing law. The panel also declined to stay federal proceedings to allow Thompson to seek reconsideration of his *Miranda* claim in the state court in light of *Siebert*, because Thompson could have made his *Siebert* claim after *Siebert* was announced, but chose not to do so.

Judge Goodwin specially concurred, observing that the majority and dissenting opinions demonstrate that the present

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

law on the validity of two-stage custodial interrogation is far from "clearly established."

Judge Berzon dissented, because the majority opinion misapplies the Supreme Court's recent decisions on waiver and forfeiture in the habeas context and "upends the fundamental principle of civil litigation that litigants are ordinarily expected to raise open questions if they want them decided." She would evaluate the *Miranda* claim under *Seibert* and conclude that the state court applied a rule contrary to clearly established federal law, rendering Thompson's confession inadmissible.

---

### COUNSEL

J. Bradley O'Connell, Assistant Director, First District Appellate Project, San Francisco, California, for Appellant.

Peggy S. Ruffra, Supervising Deputy Attorney General, Office of the Attorney General, San Francisco, California, for Appellee.

---

### OPINION

IKUTA, Circuit Judge:

This appeal requires us to determine whether the California Court of Appeal unreasonably applied "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), when it denied Antwion Thompson's motion to suppress his multiple confessions to the murder of his girlfriend. To resolve this issue, we must

first determine whether we measure the state court's opinion against *Oregon v. Elstad*, 470 U.S. 298 (1985), which was decided before the California Court of Appeal issued its opinion, or *Missouri v. Seibert*, 542 U.S. 600 (2004), which was decided after that date. In light of the Court's recent decision in *Greene v. Fisher*, 132 S. Ct. 38 (2011), which unanimously held that clearly established law must be assessed as of the time of the final state court adjudication on the merits, *id.* at 44, we hold that *Elstad* is the relevant Supreme Court precedent. Because the California Court of Appeal reasonably applied *Elstad* in holding that Thompson's confessions were admissible, we affirm the district court's denial of Thompson's habeas petition.

## I

We begin with the facts found by the California Court of Appeal, which are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1).

> In June 1998, appellant Thompson was 18 years old and lived with his father, Edward Thompson, in Bay point; the victim, Arie Bivins, was 17 years old and lived with her parents in Pittsburg. Thompson and Bivins were boyfriend and girlfriend. They had begun dating in 1997. Their relationship had deteriorated by spring 1998; Bivins wanted to break up with Thompson, who was jealous and controlling. On June 21, 1998, Thompson eavesdropped as Bivins told a friend that she was interested in another guy.

At approximately 1:30 p.m. on June 22, 1998, Edward Thompson saw appellant Thompson and Bivins talking in Bivins's car outside Thompson's home. Appellant Thompson subsequently came inside and then left again around 2:00 p.m. without saying where he was going. At about 4:00 p.m., Thompson returned home and convinced his father to drive him to Bivins's house, explaining that he was concerned about Bivins because he had been unable to reach her by telephone. When appellant and his father arrived at Bivins's house, appellant approached the front door and his father waited in the car. Edward Thompson saw appellant knock, open the front door, and then become wildly upset. Edward Thompson approached and saw Bivins on the floor by the front door with a hole in her chest and cuts on her chest and neck. He went to a neighbor's house and called 911. Paramedics subsequently confirmed that Bivins was dead. The cause of death was a stab wound to the chest.

When Pittsburg police officer Carl Webb arrived at Bivins's house at 4:22 p.m. on June 22, 1998, he observed Thompson in the driveway jumping up and down, running around, and flailing his arms. Officer Eric Solzman arrived at the scene and Webb told him to "hang on" to Thompson because they needed to talk to him. Solzman approached Thompson, who told Solzman that he did not

feel well. Solzman asked Thompson whether he wanted to lie in the back of Solzman's patrol car, because it was a warm day and the car was air conditioned, and Thompson agreed. Thompson never asked to get out of the patrol car, and Solzman never told Thompson he had to stay. Although Thompson was not free to leave in Solzman's mind, he never conveyed that to Thompson.

Pittsburg police homicide inspector John Conaty arrived at the scene at about 4:45 p.m. Thompson was in Solzman's car and appeared to be sleeping. Conaty talked to Edward Thompson, who told him about driving his son to the house and discovering the body. Conaty and his partner, Inspector Giacomelli, then approached appellant Thompson, who appeared to be waking up when they opened the door. Thompson said he was "okay" and stepped out of the car to talk to the inspectors. Conaty asked Thompson if he would be willing to go to the police station to talk about the circumstances of finding Bivins's body. Thompson said he just wanted to go home and sleep. Thompson agreed to go to the station after Conaty explained that his assistance could be critical to the investigation.

Solzman took Thompson to the police station at about 5:30 p.m. He never handcuffed or pat-searched Thompson. He put Thompson in the station's break room, which had a couch and a television. He asked

Thompson if he needed food or water. He told Thompson to relax and that he could watch television; Thompson laid down on the couch and started to watch television. Solzman told Thompson he would be outside if Thompson needed anything or had any questions. Solzman sat at a desk in the hallway to write a report; he could see Thompson in the break room through the open door. Thompson was not handcuffed; he never asked to leave, never said he was cold, and never asked for food or water. Solzman never told him he was not free to leave. Thompson slept most of the time until the inspectors arrived for him, about five and a half hours later.

Inspectors Conaty and Giacomelli approached Thompson in the station break room at about 11:00 or 11:30 p.m. Thompson said he was feeling "okay." Conaty apologized for keeping Thompson waiting and asked if they could talk to him down the hall; Thompson agreed. Thompson did not indicate that he wanted to leave, that he did not want to talk to them, or that he wanted to talk to his father. Thompson was not handcuffed, and both inspectors were wearing suits and did not have guns. The inspectors took Thompson to a small interview room with three chairs. The door was closed but not locked. When Thompson said that the room was cold, Conaty turned on the heater.

The questioning, which was videotaped, lasted about two hours. At the outset, Thompson complained of a headache. Inspector Conaty asked Thompson, "Do you feel like doing—can we do this now or would you rather do this another time? . . . You can go if you don't want to do it now." Thompson replied, "We can go through it." The inspectors then questioned Thompson for an extended period without providing *Miranda* warnings. Over the course of the questioning, Thompson admitted that he had been at Bivins's house immediately before he asked his father to take him there and that he had stabbed Bivins by accident during an argument when Bivins came at him while he was holding a knife. Subsequently, the inspectors informed Thompson of his *Miranda* rights. Thompson then repeated his earlier admissions.

At about 2:00 a.m., Thompson led the inspectors to locations where he had disposed of the knife and burned his clothes. Thompson also agreed to participate in a videotaped reenactment of Bivins's death. The reenactment commenced at about 12:47 p.m. on June 23, 1998.

Thompson was charged with murder, mayhem, and personal deadly weapon use in violation of California Penal

Code §§ 187, 203, and 12022(b)(1).[1]  The state trial court granted in part and denied in part Thompson's motion to suppress the statements he provided police on June 22 and June 23, 1998.  The court determined that Thompson was not in custody at the outset of the interrogation, but that the interrogation became custodial sometime after Thompson admitted to visiting Bivins's house alone but before he admitted to finding her there alive.  The trial court suppressed all statements made after the interrogation became custodial and before *Miranda* warnings were administered.  The video of Thompson's post-*Miranda* confession was shown to the jury, along with the videotaped reenactment of the crime. Thompson was convicted on all charges and sentenced to twenty-six years to life.

The California Court of Appeal affirmed the trial court's ruling on the suppression motion on February 3, 2004. Relying mainly on the Supreme Court's decision in *Elstad*, the court held that Thompson's post-*Miranda* statements were admissible because there was no improper police coercion during the period of unwarned questioning, and Thompson's subsequent *Miranda* waiver was knowingly and voluntarily made.   Thompson argued that *Elstad* was distinguishable because the officers in his case deliberately delayed *Miranda* warnings until after he had confessed.  For support, Thompson pointed to *Missouri v. Seibert*, 93 S.W.3d 700 (Mo. 2002), which was then pending before the Supreme Court.  The state court recognized that the Supreme Court "may clarify or expand upon the *Elstad* . . . decision[] in one or more cases currently before it," including *Seibert*, but held

---

[1] He was also charged with torture in violation of California Penal Code § 206, but that charge was later dismissed.

that "at present, we are bound by *Elstad*." The California Supreme Court summarily denied review on April 21, 2004.

On June 28, 2004, the Supreme Court issued its opinion in *Seibert*. Although there was no majority opinion, five justices agreed that when officers use a deliberate two-step interrogation process whereby they withhold *Miranda* warnings until after the suspect has confessed, postwarning statements related to the substance of the prewarning statements must be excluded unless the midstream *Miranda* warnings would apprise a reasonable person in the suspect's shoes of his rights. *Seibert*, 542 U.S. at 621–22 (Kennedy, J., concurring); *see also United States v. Williams*, 435 F.3d 1148, 1157–58 (9th Cir. 2006) (holding that Justice Kennedy's concurrence represents the holding of the Court). Under *Seibert*, *Elstad* remains good law and continues to govern the admissibility of postwarning statements "unless the deliberate two-step strategy was employed." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring); *see also id.* at 620 ("*Elstad* was correct in its reasoning and its result."); *Williams*, 435 F.3d at 1158.

Despite the Court's issuance of *Seibert* in June 2004, Thompson did not seek certiorari in the Supreme Court, nor did he file a state habeas petition. His conviction thus became final on July 20, 2004.

The following year, Thompson filed a habeas petition in federal district court, arguing, among other things, that his post-*Miranda* statements should have been excluded under *Seibert*. The state pointed out that *Seibert* was decided after the state appellate court rejected Thompson's claims on direct appeal and argued that, because the applicability of *Seibert*

was not fairly presented to the state court, Thompson's claim was not properly exhausted under 28 U.S.C. § 2254(b) or (c).

The district court declined to reach the exhaustion issue, instead holding that *Seibert* was distinguishable on the merits because Thompson had not "present[ed] any evidence in support of his assertion that the inspectors in this case deliberately withheld their *Miranda* advisement until [Thompson] had incriminated himself." Applying AEDPA deference, the district court held that the state appellate court's determination that Thompson made a valid, voluntary waiver of his *Miranda* rights was a reasonable application of *Elstad*.

Thompson timely appealed, arguing, among other things, that the state appellate court's rejection of his claim (that his post-*Miranda* statements should have been suppressed) was contrary to clearly established Supreme Court precedent. According to Thompson, *Seibert* was the relevant "clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), because the Supreme Court issued the decision before his case became final on direct review.

A divided Ninth Circuit panel reversed. *Thompson v. Runnels*, 621 F.3d 1007 (9th Cir. 2010) (*Thompson I*), *withdrawn and superseded by* 657 F.3d 784 (9th Cir. 2011) (*Thompson II*). The majority first determined that Thompson had sufficiently exhausted his challenge under *Seibert* because, in his petition for review to the California Supreme Court, Thompson fairly presented the substance of his *Seibert* claim. *Thompson II*, 657 F.3d at 794–96. Turning to the requirements of AEDPA, the majority noted that there was "some uncertainty" as to whether *Seibert* was "clearly

established Federal law" within the meaning of 28 U.S.C. § 2254(d)(1) given that it was decided after the California Supreme Court denied review but before Thompson's conviction became final, but declined to "address the merits of this procedural question" because the state did not specifically raise it. *Id.* at 796 n.7. The majority then held that the state appellate court's reliance on *Elstad*, without consideration of the rule announced several months later in *Seibert*, was "contrary to . . . clearly established Federal law" under § 2254(d)(1). *Id.* at 797. Relieved of AEDPA deference and reviewing *de novo*, the majority held that there was a *Seibert* violation because "the only reasonable inference . . . [was] that the officers deliberately withheld *Miranda* warnings until after obtaining a confession," *id.* at 799, and the delayed *Miranda* warnings were ineffective in apprising Thompson of his rights, *id.* at 799–802. The majority therefore granted the writ. *Id.* at 802. The dissent would have held that *Seibert* was not clearly established law for purposes of § 2254(d)(1) because it was decided after the last reasoned state court decision on the merits, and would have affirmed the district court. *Id.* at 804 (Ikuta, J., dissenting).

The state filed a petition for rehearing and rehearing en banc which, among other things, took issue with the majority's determination that the state had waived the argument that *Seibert* was not clearly established law. Citing *Eze v. Senkowski*, 321 F.3d 110, 121 (2d Cir. 2003), the state also argued that AEDPA's "clearly established law" requirement is not a "procedural defense but [a] standard of general applicability" and therefore cannot be waived by the state. In a published order, the Ninth Circuit denied rehearing and rehearing en banc. *Thompson II*, 657 F.3d at 784. Seven judges dissented from the denial of rehearing en banc. *Id.*

The state petitioned the Supreme Court for certiorari, arguing that the California Court of Appeal had faithfully applied *Elstad*, which was the clearly established Supreme Court precedent at the time of its decision, and that the Ninth Circuit panel majority erred in assessing "clearly established Federal law" at the time Thompson's conviction became final, instead of at the time of the state court decision. *See* Brief for Petitioner at 12, *McEwen v. Thompson*, 132 S. Ct. 578 (2011) (No. 11-305), 2011 WL 3978775, at *12.

While the certiorari petition was pending, the Supreme Court decided *Greene*. In *Greene*, a habeas petitioner claimed he was entitled to relief under a Supreme Court decision issued while his post-conviction review petition to the state supreme court was pending. 132 S. Ct. at 43–44. In rejecting this argument, the Court unanimously held that "clearly established Federal law" does not include the decisions of the Supreme Court "that are announced after the last adjudication of the merits in state court but before the defendant's conviction becomes final." *Id.* at 42. For purposes of § 2254(d)(1), therefore, "clearly established Federal law" refers to the holdings of the Supreme Court "as of the time the state court renders its decision." *Id.* at 44 (internal quotation marks omitted). *Greene* thus resolved the timing issue raised by the state in its petition for certiorari in *Thompson II*.

On November 14, 2011, the Supreme Court granted the state's petition for certiorari, vacated the judgment in *Thompson II*, and remanded the case to the Ninth Circuit "for further consideration in light of [*Greene*]." *McEwen v. Thompson*, 132 S. Ct. 578 (2011). We requested supplemental briefing and reargument in light of the Supreme Court's decision. The state argued that, in light of *Greene*,

we must now consider whether the state appellate court's analysis of Thompson's *Miranda* claim was a reasonable application of *Elstad.* Thompson argued that the state waived or forfeited that argument, and that, in any event, he was entitled to relief even under *Elstad*.

## II

Thompson seeks relief on the ground that his Fifth Amendment rights were violated by the state trial court's admission of his post-*Miranda* statements, and argues that we are not precluded from granting relief under AEDPA because the state appellate court's rejection of this claim was an unreasonable application of clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). As directed by the Supreme Court, we must now reconsider Thompson's claim for federal habeas relief in light of *Greene*.

We look to the last reasoned state court adjudication on the merits of Thompson's *Miranda* claim, which was the decision of the California Court of Appeal on February 3, 2004. *See Greene*, 132 S. Ct. at 44–45. *Greene* has now confirmed that at the time the state court rendered its decision, the clearly established Supreme Court precedent was *Elstad*, because *Seibert* had not yet been decided. *Id*. at 44. Under § 2254(d)(1) and binding Supreme Court precedent, we cannot grant habeas relief unless the state court's adjudication of Thompson's *Miranda* claim was an "unreasonable application" of *Elstad*. *See id.* at 44 (2011) ("As we explained, § 2254(d)(1) requires federal courts to 'focu[s] on what a state court knew and did,' and to measure state-court decisions 'against this Court's precedents *as of 'the time the state court renders its decision*.'" (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399 (2011))).

In light of this conclusion, we must determine whether the state appellate court's decision was "contrary to, or an unreasonable application of" *Elstad*. In *Elstad*, a defendant made incriminating statements before receiving *Miranda* warnings, and attempted to suppress his post-*Miranda* confession on the ground that the unwarned statements "let the cat out of the bag" and therefore induced the post-warning confession. *Elstad*, 470 U.S. at 302. The Supreme Court rejected the defendant's argument, holding that while "the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309.

Here, the California Court of Appeal's determination that Thompson's post-*Miranda* confessions were admissible was not contrary to or an unreasonable application of *Elstad*. The state court correctly explained that, under *Elstad*, "so long as the earlier [unwarned] statement was not involuntary due to police coercion, the subsequent voluntary, warned statement is admissible." Applying this standard, the court concluded that "there was no improper police coercion during the period of unwarned questioning and that Thompson's statements during that period were voluntary." The court emphasized that "the overall environment was relatively unintimidating and nonoppressive," and that "the inspectors did not make promises or threats and the overall tenor of questioning was not coercive." The court then concluded that Thompson's subsequent *Miranda* waiver was knowing and voluntary:

> Although young, Thompson was not a minor in June 1998, and the fact that he may have a learning disability does not indicate that he was unable to understand his rights. As the

trial court concluded, the videotape shows that
Inspector Conaty properly informed
Thompson of the *Miranda* rights and that
Thompson indicated that he understood those
rights with a nod of his head. The videotape
indicates that the inspectors were careful,
polite, and soft-spoken, not overbearing.
Nothing on the videotape indicates that
Thompson did not understand his rights or
was reluctant to speak to the inspectors.

The court also held that admission of the videotaped
reenactment was also proper: "Although Thompson spent a
cold and uncomfortable night in the county jail following the
interrogation, he was fed and again advised of his *Miranda*
rights before doing the interrogation." The court concluded
there was no "indication of coercion surrounding the
reenactment."

Thompson argues that the state court unreasonably
applied *Elstad* because the officers' interrogation tactics,
including use of "implied promises of leniency and
misrepresentations" rendered his post-*Miranda* statements
involuntary. The state court was not unreasonable in
rejecting this argument. Police interrogation tactics that do
not rise to the level of coercion do not make a confession
involuntary. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990)
("Ploys to mislead a suspect or lull him into a false sense of
security that do not rise to the level of compulsion or coercion
to speak are not within *Miranda*'s concerns."). The state
court could reasonably have concluded that the officers'
tactics did not rise to that level. As the court correctly noted,
"the inspectors never promised, either expressly or impliedly,
any specific benefits that would flow to Thompson if he

confessed," and "the general thrust of the inspectors' statements was that it would be better for Thompson if he told the truth and that his punishment would depend on the particular circumstances of the killing" and the judgment of the District Attorney. Although Thompson argues that he was more susceptible to the officers' tactics because he was only eighteen and had a learning disability, the state court reasonably concluded that "the record does not reveal such youthfulness and low intelligence that Thompson would have been unusually vulnerable to the inspectors' tactics."

Finally, Thompson claims that the state court erred in rejecting his *Elstad* claim because his *Miranda* waivers were not knowing and voluntary. Again, the state court's rejection of this argument was not an unreasonable application of *Elstad*, given that the officers fully advised Thompson of his rights before he reiterated his confession on June 22, 1998, and again before he participated in the videotaped reenactment of the murder on the following day, and Thompson affirmed that he fully understood his rights.

Because we conclude that the state court's decision affirming the trial court's denial of Thompson's motion to suppress the post-*Miranda* statements was not contrary to or an unreasonable application of *Elstad*, AEDPA precludes relief.

### III

Notwithstanding this clear precedent, Thompson argues that we should not consider whether the state court's decision was an unreasonable application of *Elstad*. The state, he argues, waived or forfeited the argument that only *Elstad* was "clearly established Federal law" for purposes of § 2254(d)(1)

by failing to raise it in its briefs to the district court and to us in its original response brief.    Therefore, according to Thompson, this court must assess his habeas petition as though *Seibert* were relevant for § 2254(d)(1) purposes.

We disagree.  The Supreme Court has made clear that in adjudicating a claim or issue pending before us, we have the authority to identify and apply the correct legal standard, whether argued by the parties or not.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).  Once "an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties."   *Id*. Instead, the court "retains the independent power to identify and apply the proper construction of governing law," *id*., and is free to "consider an issue antecedent to . . .  and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief,"  *U.S. Nat'l Bank of Oregon v. Ind. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)) (internal quotation marks omitted); *see also In re Greene*, 223 F.3d 1064, 1068, n.7 (9th Cir. 2000) (holding that the court could consider a statutory interpretation argument not specifically raised by the defendant because, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties." (quoting *Ind. Ins. Agents.*, 508 U.S. at 446)).

For the same reason, "parties are not limited to the precise arguments they made below."    *Lebron v. National R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995); *see also Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 893 (2010) (allowing plaintiffs to raise a new argument on appeal to support a "consistent claim" that a statute violated First Amendment rights); *Engquist v. Oregon Dept. of Ag.*,

478 F.3d 985, 996 n.5 (9th Cir. 2007) (holding that we may hear new arguments on appeal if they are "intertwined with the validity of the claim"); *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) ("[I]t is claims that are deemed waived or forfeited, not arguments."). Thus, we may consider new legal arguments raised by the parties relating to claims previously raised in the litigation.[2]

Here, Thompson's claim that he is entitled to habeas relief because the state trial court violated his Fifth Amendment rights by failing to suppress his post-*Miranda* statements is properly pending before us. Under AEDPA, we may not grant habeas relief unless the state appellate court's adjudication of this claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1). In order to resolve the question whether the state court's decision met this standard, we must first address the antecedent question whether *Elstad* or *Siebert* is the relevant "clearly established Federal law." § 2254(d)(1). We have the authority to identify and apply the correct governing law necessary to dispose of the claim pending before us, *Ind. Ins. Agents of Am., Inc.*, 508 U.S. at 447, and thus we do not abuse our discretion by determining that *Elstad* is the relevant clearly established Supreme Court precedent, *id.*

---

[2] The dissent argues that these cases are not applicable because the state did not raise a new argument on appeal. Dis. op. at 34 n.4. This is incorrect; the state elaborated its argument that *Siebert* was not the relevant "clearly established Federal law" in the supplemental appellate briefs we ordered the parties to submit after the Supreme Court vacated our prior opinion.

The Supreme Court's recent decision in *Wood v. Milyard*, 132 S. Ct. 1826 (2012), is not contrary to this conclusion. In *Wood*, a federal appellate court asked the state to provide supplemental briefing regarding a statute of limitations defense to a habeas petition, and subsequently dismissed the habeas petition as untimely. The Supreme Court held the federal court abused its discretion by considering, sua sponte, an affirmative defense that had been deliberately waived by the state. (The state had twice informed the court that it was not challenging the timeliness of the habeas petition.) *Id.* at 1830.[3]

*Wood*'s holding is not applicable to our consideration of the correct interpretation of § 2254(d)(1), which is not an affirmative defense.[4] *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) ("The petitioner carries the burden of

---

[3] The Court distinguished deliberate waivers from forfeitures, holding that "the bar to court of appeals' consideration of a forfeited habeas defense is not absolute," and "federal appellate courts have discretion, in exceptional cases, to consider a nonexhaustion argument inadverten[tly] overlooked by the State in the District Court." *Id.* (internal quotation marks and citations omitted).

[4] The dissent states that we err in limiting *Wood* to "a case regarding an 'affirmative defense'" because it addresses waiver of both claims and defenses. Dis. op. at 32 n.3. We disagree. The specific issue in *Wood* was not whether an appellate court may decline to hear a waived claim or defense, but whether an appellate court *abuses its discretion* if it considers an issue that a party has waived. As to that issue, *Wood*'s holding was narrow: it held only that it would be an abuse of discretion for an appellate court "to override a State's deliberate waiver" of an affirmative defense. 132 S. Ct. at 1834–35. Nothing in *Wood* casts doubt on the longstanding validity of the rule that once "an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen*, 500 U.S. at 99.

proof" with respect to § 2254(d)'s requirements); *see also Price v. Vincent*, 538 U.S. 634, 641 (2003) (stating that "it is the habeas applicant's burden to show that the state court applied [a Supreme Court case] to the facts of his case in an objectively unreasonable manner" under § 2254(d)(1)); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (same). For the same reason, Thompson's attempt to analogize our consideration of § 2254(d)(1) to the non-retroactivity principle established by *Teague v. Lane*, 489 U.S. 288 (1989), fails: the *Teague* non-retroactivity principle is also an affirmative defense that must be raised by the state. *See Caspari v. Bohlen*, 510 U.S. 383, 389 (1994) (holding that "a federal court may, but need not, decline to apply *Teague* if the State does not argue it," but "if the State does argue that the defendant seeks the benefit of a new rule of constitutional law, the court must apply *Teague* before considering the merits of the claim"); *see also Danforth v. Minnesota*, 552 U.S. 264, 289–90 (2008).

Although we are not barred from considering a new argument on appeal, we generally take care to avoid the unfairness inherent in deciding cases on bases not raised or passed upon in the tribunal below. For instance, we have held that we "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief," *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir.2003), subject to certain exceptions, *see Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996).[5] Moreover, we have authority to decline to hear even new legal arguments not

---

[5] We apply this rule when a party raises a new claim, *Kimes*, 84 F.3d at 1126, but not when a party raises a new argument to support a claim already pending before the court, *see In re Greene*, 223 F.3d at 1068, n.7.

timely raised by the parties. *See, e.g.*, *James v. Ryan*, 679 F.3d 780, 802 (9th Cir. 2012).

In this case, however, it is appropriate to apply the correct legal standard to Thompson's claim. The question whether the state court's opinion should be measured against *Elstad* or *Seibert* has been presented by both parties throughout this appeal.[6] After *Greene* was decided, both parties had an opportunity to brief the question regarding which Supreme Court precedent was the applicable clearly established federal law for purposes of § 2254(d)(1). Because the legal issue has been fully addressed by both parties, and because it is a simple and straightforward question of law, we do not abuse our discretion in addressing it. *Ind. Ins. Agents of Am., Inc.*, 508 U.S. at 447.[7]

# IV

Thompson further contends that even if the state did not waive or forfeit its argument that *Seibert* is not applicable to

---

[6] The state originally argued that *Seibert* was inapplicable because it was decided after the state court rendered its decision, and that, as a result, Thompson never exhausted his *Seibert* argument. *See Blair v. California*, 340 F.2d 741 (9th Cir. 1965) (holding that even when a petitioner presented the substance of his claim to the state court, the petitioner had to reexhaust that claim if a later-decided Supreme Court opinion cast the claim in a different light). The Supreme Court's reasoning in *Greene* clarified that *Seibert* is inapplicable under § 2254(d)(1) for the same reason: it had not yet been decided at the time the state court rendered its decision. Therefore, the state's position that Thompson's *Seibert*-based argument was unexhausted is consistent with its current argument that *Seibert* is not clearly established Supreme Court precedent under *Greene*.

[7] In light of the narrowness of our holding, the dissent's parade of horribles, dis. op. at 37, seems misplaced.

his petition, we should stay the federal proceedings in order to allow him to seek reconsideration of his *Miranda* claim in state court in light of *Seibert*. He bases his argument on our decision in *Gonzalez v. Wong*, 667 F.3d 965 (9th Cir. 2011), *petition for cert. filed sub. nom Chappell v. Gonzales*, 80 U.S.L.W. 3710 (U.S. May 18, 2012) (No. 11-1397). In that case, a prosecutor failed to turn over certain *Brady* materials to the petitioner until all state proceedings had been completed. Because the suppressed materials substantially strengthened the petitioner's *Brady* claim, we remanded that portion of the petitioner's case to the district court, with instructions to stay the habeas proceedings until the petitioner had an opportunity to present the new evidence to the California Supreme Court. *Id.* at 999.

*Wong* is not applicable here. In *Wong*, the petitioner argued that he had been unable to present his claim in state court because of the state's suppression of evidence. Here, on the other hand, Thompson had all the evidence he needed to make his *Seibert* claim in state court after *Seibert* was announced, but he chose not to do so. Thompson's situation is precisely the same as the petitioner's in *Greene*. In rejecting the petitioner's request for the Court to interpret "clearly established Federal law" to include Supreme Court precedent issued after the date of the relevant state court opinion, *Greene* noted that the petitioner's "predicament [was] an unusual one of his own creation" because he had given up "two obvious means of asserting his claim" by failing to seek certiorari in the Supreme Court or file a petition for state post-conviction relief. 132 S. Ct. at 45. Like the petitioner in *Greene*, Thompson also had the opportunity to seek certiorari in the Supreme Court, where he was likely to obtain a remand in light of *Seibert*, and to file a

habeas petition in state court, but he did neither.  We therefore decline to order a stay of federal proceedings.

## V

Thompson's habeas petition is governed by AEDPA, and the validity of his claim must be assessed under § 2254(d)(1). *Elstad* is the relevant "clearly established Federal law" for purposes of this § 2254(d)(1) analysis and, under *Elstad*, Thompson's rights were not violated.  Thompson's petition is therefore denied.

**AFFIRMED.**

GOODWIN, Senior Circuit Judge, specially concurring:

A strict adherence to 28 U.S.C. § 2254 (AEDPA) compels me to conclude that the California courts did not unreasonably apply clearly established Supreme Court law in following *Oregon v. Elstad*, 470 U.S. 298 (1984) instead of *Missouri v. Seibert*, 542 U.S. 600 (2004).  The two scholarly opinions written by my colleagues in this persistent appeal demonstrate that the present law on the validity of two-stage custodial interrogation is far from "clearly established."

In 1966, as a state appellate judge, I learned from the United States Supreme Court that voluntary confessions obtained by police interrogation could no longer be used by state prosecutors unless the confession survived Miranda scrutiny.  For the next 46 years, as a state and federal judge, reading trial records and judicial opinions about "voluntary" confessions obtained by custodial interrogations, I learned

how law enforcement behavior evolves and that even the Supreme Court can change its position on interrogation strategy.

The "GVR" that brings this panel back to Mr. Thompson's two-stage confession requires us to re-examine the confession without reference to Supreme Court law that emerged after Thompson's state-court review had ended in the California Court of Appeal, and after the state Supreme Court had denied further review, but before the time for a cert petition expired. During that interval, the United States Supreme Court may have modified its own views on delayed warnings in custodial interrogation, or it may not have done so. Who knows?

I concur in Judge Ikuta's opinion, and commend Judge Berzon for pointing out the procedural confusion caused by the various briefing positions taken by the state.

---

BERZON, Circuit Judge, dissenting:

The original panel opinion analyzed Thompson's habeas petition under *Missouri v. Seibert*, 542 U.S. 600 (2004), the case that both parties assumed was "clearly established Federal law" for purposes of 28 U.S.C. § 2254(d)(1) in this appeal. Only after the respondent (whom I refer to as the "State") lost in the panel's original decision did the State first advance the argument that *Seibert* was *not* the relevant precedent under § 2254(d)(1). The majority now holds that despite the State's extraordinary delay in raising that argument, the argument was neither forfeited nor waived. Maj. Op. at 17–22. Because the majority misapplies the

Supreme Court's recent decisions on waiver and forfeiture in the habeas context and upends the fundamental principle of civil litigation that litigants are ordinarily expected to raise open questions if they want them decided, I respectfully dissent.

**I**

I begin by describing the magnitude of the State's delay before making the about-face in its litigation strategy that the majority now excuses.

**A**

At the time the State filed its brief in July 2009, this court's cases contained contradictory statements concerning the time frame for determining "clearly established" law under § 2254(d)(1), reflecting, in turn, conflicting guidance by the Supreme Court. But the issue was an open one, both in the Supreme Court and this court.

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court characterized "clearly established Federal law" as measured alternately "at the time [the] state-court conviction became final," *id.* at 390 (majority opinion, Part III, by Justice Stevens), and "as of the time of the relevant state-court decision," *id.* at 412 (majority opinion, Part II, by Justice O'Connor). Later cases noted the contradiction but did not resolve it. *See Smith v. Spisak*, 130 S. Ct. 676, 681 (2010); *see also Bobby v. Dixon*, 132 S. Ct. 26, 31 n.3 (2011) (per curiam); *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 n.2 (2010) (per curiam).

Our cases reflected the Supreme Court's lack of clarity. For example, *Jackson v. Giurbino*, 364 F.3d 1002 (9th Cir. 2004), stated that "[t]he relevant law must have been clearly established by the time [the petitioner's] conviction became final in the state courts." *Id.* at 1005 (citing *Williams*, 529 U.S. at 390). Other cases, including *Fowler v. Sacramento County Sheriff's Department*, 421 F.3d 1027 (9th Cir. 2005), instructed that "'clearly established Federal law' . . . refers to . . . the time of the relevant state-court decision, which is the 'last reasoned decision' by the state court." *Id.* at 1034 (citations omitted). Yet, although our case law contained such contradictory statements in passing, there was, as far as I can tell, no case in which the timing issue mattered in determining the applicable Supreme Court precedent.[1] Nor does the State or the majority opinion suggest otherwise.

The State did not argue in its answering brief that the *Fowler* version of these divergent rules applies. In light of the lack of a controlling precedent in which there was an actual holding on the issue, the State could have argued for its present position. Or it could have maintained that the *Fowler* rule governed in this case in any event, because *Seibert* was decided *after* the last state court ruling (the denial of discretionary review by the California Supreme Court), and no petition for a writ of certiorari had been filed with the United States Supreme Court.

In fact, instead of presenting the argument that *Seibert* was not the measure of "clearly established Federal law," or

---

[1] The Second Circuit also noted the Supreme Court's "inconsistent guidance" on the timing issue in a case in which it did "not matter which formulation applie[d]." *See Brown v. Greiner*, 409 F.3d 523, 533 n.3 (2d Cir. 2005).

at least raising the issue of this court's conflicting statements, the State's initial brief in this court definitively "stated, citing Justice Stevens' opinion for the Court in *Williams* . . . , that the law to be applied under [the Antiterrorism and Effective Death Penalty Act (AEDPA)] is that 'clearly established at the time [Thompson's] state court conviction became final.'" *See Thompson v. Runnels*, 657 F.3d 784, 796 n.7 (9th Cir. 2011) (*Thompson II*), *vacated sub nom. McEwen v. Thompson*, 132 S. Ct. 578 (2011).   The original dissent recognized that the State did not "argu[e] that *Seibert* was not 'clearly established' Supreme Court precedent relevant to Thompson's claim under AEDPA." *Thompson v. Runnels*, 621 F.3d 1007, 1023 n.1 (9th Cir. 2010) (*Thompson I*) (Ikuta, J., dissenting), *withdrawn and superseded by Thompson II*, 657 F.3d 784.   And the State so noted in its Petition for Rehearing with Suggestion for Rehearing En Banc, stating: "We acknowledged . . . at oral argument we did not raise this issue." *See Thompson II*, 657 F.3d at 796 n.7.   In light of the State's failure to argue to the contrary, the original majority decision appropriately held that as in *Smith v. Spisak*, because "the parties had not raised the issue," it was "not properly before us." *Thompson I*, 621 F.3d at 1015 n.7; *Thompson II*, 657 F.3d at 796 n.7.

**B**

Under our case law, an appellee who fails to raise an issue in an answering brief forfeits it. *Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009).   The circumstances described above are therefore enough to establish that the State forfeited the argument.

But the State did more than just that.   It accepted the petitioner's argument that *Seibert* was the relevant precedent,

and then erected its own argument on that understanding, maintaining that Thompson should have exhausted his *Seibert* argument in the state courts before coming to federal court. *See Thompson I*, 621 F.3d at 1013.**²** Specifically, the State argued that "'[t]he threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established *at the time his state-court conviction became final*,'" (quoting *Williams*, 529 U.S. at 390) (emphasis added), and then argued that because Thompson "never fairly presented to the state courts the issue of deliberate police action under *Seibert*," Thompson's petition was "unexhausted." *Greene* resolved an issue distinct from exhaustion, namely whether a Supreme Court case decided after the last-reasoned state court decision on the merits is "clearly established Federal law" under § 2254(d)(1), *see* 132 S. Ct. 38, regardless of what arguments were "fairly presented" in state court, *see Thompson II*, 657 F.3d at 794–95.

The majority's attempt to equate the argument that the State actually made and the argument that the State forfeited but that the majority now reaches is thus unconvincing. *See* Maj. Op. at 22 n.6. Instead, by making its exhaustion argument while accepting that for § 2254(d)(1) purposes law is clearly established when the conviction becomes final, the State "deliberately steered" the panel away from the question on which the majority now rests its opinion. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012).

---

**²** The original opinion rejected the State's exhaustion argument on its merits. *See Thompson I*, 621 F.3d at 1013.

## C

The State's other litigation choices further underscore the extent to which the State steered this court *away* from any argument that *Seibert* was not the relevant precedent against which to measure the last reasoned state-court decision. At the February 10, 2010 argument, the following exchange transpired:

> Judge Ikuta: Is the State waiving the argument that *Missouri v. Seibert* was not clearly established at the time the state court rendered the decision? Because the State does have the power to waive that, and we would apply *Missouri v. Seibert* to the state court's decision. So are you waiving that argument?
>
> Counsel: Well, I have to admit, Your Honor, we did not raise it, so—
>
> Judge Ikuta: Are you waiving it on behalf of the State?
>
> Counsel: I don't feel I'm in the position to waive it on behalf of the State, but I have to acknowledge, as [Judge] Berzon pointed out, that we did not raise that in our briefs, so—
>
> Judge Berzon: And you more than didn't raise it. You assumed its nonexistence.
>
> Counsel: I think that's correct, Your Honor. But in terms of the State['s] position, I can't

stand here and say that the state is waiving
that argument.

Notwithstanding the State's refusal at oral argument
affirmatively to state that it was "waiving" the argument, the
Supreme Court's recent decision in *Wood v. Milyard*, 132
S. Ct. 1826 (2012), confirms that by its actions, the State *did*
waive the position it now espouses. By the time oral
argument concluded, the State's forfeiture — or failure to
preserve its argument — had become a waiver — that is, a
knowing and intelligent relinquishment of the argument. *See
id.* at 1832 n.4.

In *Wood*, the Court construed as a "waiver" a similar
representation by the office of the Attorney General of
Colorado in a § 2254 habeas case. In that case, the district
court instructed the "State [of Colorado] to file a preanswer
response . . . 'addressing the affirmative defense[] of
timeliness.'" *Id.* at 1830 (internal citation omitted). The
State responded: "Respondents will not challenge, but are not
conceding, the timeliness of . . . [the] habeas petition." *Id.*
(internal quotation marks omitted). "Consistently, in its full
answer to [the] . . . petition, the State repeated: 'Respondents
are not challenging, but do not concede, the timeliness of the
petition.'" *Id.* at 1830–31. After the district court dismissed
the habeas petition on grounds other than timeliness, the
Court of Appeals for the Tenth Circuit ordered the parties to
the appeal to brief the timeliness issue. *Id.* at 1831. The
Supreme Court reversed, explaining that the State had waived
the timeliness argument, and that the Tenth Circuit abused its

discretion by dismissing the petition on that procedural ground despite the State's waiver. *Id.* at 1834.**³**

Most relevant here is that despite Colorado's repeated mantra that it was not "conced[ing]" its timeliness argument, *Wood* construed its response as a waiver. The Court characterized the State's responses to the district court's briefing order as "deliberately steer[ing]" that court "away from the question," rather than as "inadvertent error." *Id.* at 1835 (quotation marks omitted). "In short, the State knew it had an 'arguable' statute of limitations defense, yet it chose, in no uncertain terms, to refrain from interposing [such a] challenge." *Id.* at 1835 (internal citation and quotation marks omitted). Colorado had therefore waived, that is "intentional[ly] relinquish[ed] or abandon[ed]," "a known right." *Id.* at 1835.

The circumstances here were, if anything, *more* indicative of a waiver than those in *Wood*. The State made an earlier decision not to brief, and therefore "not to contest," Thompson's position as to the time at which clearly established law was to be measured. *See id.* at 1835. Instead, it quoted in its brief the contrary rule to the one for which it now argues and constructed an argument assuming that rule. In the face of questioning from this court, the State acknowledged that briefing position and, after hearing that there might be a contrary plausible position, did not backtrack

---

**³** The majority makes no effort to address *Wood*'s holding regarding under what circumstances a party's litigation decisions result in a waiver, and instead endeavors to distinguish *Wood* as a case regarding an "*affirmative* defense." *See* Maj. Op. at 20 & n.4 (emphasis added). *Wood* cannot be so narrowly construed. *See Wood*, 132 S. Ct. at 1832 n.4 (discussing waiver of both "claim[s]" and "defense[s]").

from its earlier assumption, stating that it was "correct" that it had briefed the case on the understanding that *Seibert* was clearly established federal law at the relevant time. Analogously to *Wood*, at least by the time of the oral argument, "the State knew it had an 'arguable' [clearly established Federal law] defense, yet it chose, in no uncertain terms, to refrain from interposing [such] a 'challenge,'" *see Wood*, 132 S. Ct. at 1835, then or afterwards, until after it had lost in the original panel opinion, *see infra* Section I.D. As the Seventh Circuit has held, where a government attorney "learn[s] at oral argument that there was a potential procedural argument, [and] then inform[s] the court that the argument was not being asserted," under *Wood*, "[w]hy a litigant comes to such a decision is irrelevant, and a mistake in reaching a decision to withhold a known defense does not make that decision less a waiver." *Ryan v. United States*, 688 F.3d 845, 848 (7th Cir. 2012).

In short, *Wood* and *Ryan* make plain the State's waiver here.

**D**

Not until after the panel issued its original opinion, with the dissent taking the view that "clearly established Federal law" referred to "the time of the relevant state-court decision," *Thompson I*, 621 F.3d at 1023 (Ikuta, J., dissenting), did the State in its petition for rehearing en banc finally raise the issue on which the majority's new decision turns — namely how to determine which Supreme Court precedent constitutes "clearly established Federal law" under

AEDPA, *see Thompson II*, 657 F.3d at 796 n.7.**[4]**  Our cases make crystal clear that the government — like any other litigant — is not entitled to raise an entirely new issue for the first time in a petition for rehearing.  *See Fields v. Palmdale Sch. Dist.*, 447 F.3d 1187, 1190 (9th Cir. 2006).

The majority nevertheless contends that despite the State's decision to wait until its petition for rehearing en banc to argue that *Seibert* was not the measure of clearly established federal law, we should now disregard *Seibert*. *See* Maj. Op. at 17–22.  But nowhere does the majority account for the State's egregious delay in making that argument, nor does the majority explain why the State should benefit from the fortuitous timing of the Supreme Court's decision to grant certiorari in *Greene* while the State's petition for rehearing en banc was pending.

The majority's decision to excuse the State's waiver might be more tenable if our practice were to bend over backwards to make the same concessions for habeas petitioners.  But the trajectory of federal habeas law in the past decades has been a series of "ceaselessly changing and ever expanding series of rules," with which "all but the most unusual of petitioners" are deemed noncompliant.  *Leavitt v. Arave*, 682 F.3d 1138, 1142 (9th Cir. 2012) (Reinhardt, J., concurring).  For example, in *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008), a habeas petitioner was held to have

---

[4] Because the State did not raise its "clearly established Federal law" argument in its answering brief, and instead waited until the panel issued its decision to make the argument for the first time in its petition for rehearing en banc, the cases the majority cites for the proposition that under certain circumstances we may consider arguments raised by the parties in their briefs on appeal even if not raised in lower court proceedings, *see* Maj. Op. at 18, 19 & n.2, are inapposite.

forfeited the argument that the state court's interpretation of state law was erroneous "by failing to raise it either in the district court or in his brief on appeal, mentioning it for the first time at oral argument." Similarly, the habeas petitioner in *Robinson v. Kramer*, 588 F.3d 1212, 1218 (9th Cir. 2009), forfeited claims raised in state habeas petitions and in the district court by not renewing them on appeal.

The Supreme Court has instructed us that federal judges "have no obligation to act as counsel or paralegal to *pro se* litigants," by advising how to exhaust and avoid procedural default, and that "by the same token, [judges] surely have no obligation to assist attorneys representing the State." *Day v. McDonough*, 547 U.S. 198, 210 (2006) (internal citation and quotation marks omitted). We lose credibility as an impartial arbiter of habeas cases when we discard the "ordinar[]y" rules of "civil litigation" to save governmental parties from their own litigation choices. *Wood*, 132 S. Ct. at 1832. States are entitled to a great degree of deference under AEDPA, but *not* when they confound federal courts' ability to adjudicate cases according to the "principle of party presentation basic to our adversary system." *Id.* at 1833. Entertaining an argument raised for the first time on a petition for rehearing is no way for a court to handle litigation with any degree of efficiency or regard for fairness to the parties.

There are also considerations of judicial self-governance and efficient, effective decisionmaking compromised by the majority's refusal to hold the State to its litigation choices. As a practical matter, "we rely on the parties to frame the issues for decision," as "our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United*

*States*, 554 U.S. 237, 243–44 (2008) (internal quotation marks and citation omitted).  Sometimes, however, we discover that the parties are so mistaken in their legal assumptions — whether due to faulty research or illogical analysis — that we cannot and do not proceed on an erroneous basis.  *See id.* at 262–64 (Alito, J., dissenting) (collecting cases).  Where, however, (1) the legal question is a debatable one; (2) the pertinent party is so apprised by the court and specifically asked at argument whether it wishes to alter its position; and (3) the party instead sticks to a position *incompatible* with the one it later adopts, the court cannot sensibly decide the question the party has declined to advance.  To do so simply multiplies the court's work, requiring it to (1) decide the question the party does present; and then (2) decide the other question the party refused to address, necessitating entirely new research and analysis.  The alternative of waiting to see whether the issue is finally raised in a petition for rehearing is even worse: We rehear cases when the court has made a mistake, not when a party has made a mistake.

Nor does the fact that the case is before the court on the Supreme Court's grant of certiorari, vacatur, and remand (GVR) change the approach appropriate here.  The Supreme Court's only instruction to this court was that the case be considered further "in light of *Greene v. Fisher.*"  *See McEwen v. Thompson*, 132 S. Ct. 578 (2011) (citing *Greene*, 132 S. Ct. 38 (2011)).  A GVR order does not represent any conclusion that a new case *is* determinative, only that it is "potentially relevant."  *Stutson v. United States*, 516 U.S. 193, 197 (1996) (per curiam); *see Lawrence v. Chater*, 516 U.S. 163 (1996) (per curiam).  The State's waiver of the argument that *Seibert* was not "clearly established Federal law" is ample reason that *Greene* does not control here.

## II

The majority's decision to endorse the State's eleventh-hour about-face regarding its litigation strategy leads to one of two possibilities for how habeas litigation will now proceed. The first is that we will ourselves be responsible for coming up with all the Supreme Court precedents possibly relevant to determining whether a state court's decision was an unreasonable application of clearly established Supreme Court precedent, no matter how the parties have framed their arguments. The second is that we will let the parties change their litigation strategies at any time, including after briefing is completed, after oral argument has taken place, and after the panel renders its decision. Each of these approaches is supremely inefficient and disregards basic precepts of our adversarial system. The court's fair and efficient functioning depends on the "principle of party presentation basic to our adversary system." *Wood*, 132 S. Ct. at 1833. And impartiality demands that "we should be no less vigorous in applying . . . against the government" the rule that arguments not raised on appeal are forfeited than we are in applying that rule "against criminal defendants." *United States v. Ziegler*, 497 F.3d 890, 901 (9th Cir. 2007) (Kozinski, J., dissenting from the denial of rehearing en banc).

Because I would analyze the merits of Thompson's Miranda claim under the Supreme Court's decision in *Seibert*, I would conclude, for the reasons given in the original panel opinion, that the California Court of Appeal applied a rule contrary to "clearly established Federal law," and, that, applying *Seibert* de novo, Thompson's confession was inadmissible. *See Thompson II*, 657 F.3d at 796–801. I therefore respectfully dissent from the majority's decision to

allow the State's switch in time to triumph, and would grant
Thompson's habeas petition.[5]

---

[5] Because I would grant Thompson's habeas petition, I need not reach
his alternate argument that we should stay his federal habeas proceedings
pending any further state court proceedings. *See* Maj. Op. at 22–24.
Nonetheless, if I were to hold — notwithstanding the State's multiple
waivers — that *Elstad* is the relevant "clearly established Federal law" for
purposes of Thompson's case in its current posture, I would remand to the
district court with instructions to stay proceedings to permit Thompson to
present his *Seibert* argument in a petition for state postconviction relief.
*See Rhines v. Weber*, 544 U.S. 269, 278 (2005); *Gonzalez v. Wong*,
667 F.3d 965, 972, 980 (9th Cir. 2011), *cert. denied*, 133 S. Ct. 155
(2012). As I have explained, the measure of "clearly established Federal
law" was only recently resolved, *see Greene*, 132 S. Ct. 38, and the State
accepted until its petition for rehearing that *Seibert* was the relevant
precedent for deciding Thompson's petition, asserting in its brief a rule for
determining the timing of clearly established Supreme Court law contrary
to the one adopted in *Greene*. Under the unique circumstances of this
case, then, Thompson had "good cause" for not pursuing state
postconviction remedies earlier, and "has not engaged in intentional
dilatory litigation tactics." *Gonzalez*, 667 F.3d at 980; *see Rhines*,
544 U.S. at 278. And in my view, for the reasons stated in the original
opinion, *see Thompson II*, 657 F.3d at 796–801, Thompson has a
"meritorious" *Seibert* claim, *see Rhines*, 544 U.S. at 278; *Gonzalez*,
667 F.3d at 980. The majority therefore abuses its discretion by denying
a stay and effectively foreclosing any further federal review of
Thompson's claim. *See Rhines*, 544 U.S. at 278.